1  D. GILL SPERLEIN (172887)
2  THE LAW OFFICE OF D. GILL SPERLEIN
   584 Castro Street, Suite 879
3  San Francisco, California  94114
   Telephone: (415) 404-6615
4  Facsimile: (415) 404-6616
5  gill@sperleinlaw.com

6  MARC JOHN RANDAZZA (269535)
   Liberty Media Holdings, LLC, General Counsel
7  10620 Southern Highlands Pkwy. #110-454
   Las Vegas, Nevada 89141
8  Telephone: (888) 667-1113
   Facsimile: (305) 437.7662
9  marc@corbinfisher.com

10
   Attorneys for Plaintiffs
11

12            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
13                  OAKLAND DIVISION

14
                                    )
15 IO GROUP, INC., a California corporation,  )  **CASE NO.:  C-10-1282 (MMC)(DMR)**
   CHANNEL ONE RELEASING, Inc., a   )
16 California corporation and LIBERTY   )
   MEDIA HOLDINGS, LLC., a California   )  **PLAINTIFFS' MOTION FOR**
17 corporation,                        )  **TERMINATNG SANCTIONS FOR**
                                    )  **SPOLIATION OF EVIDENCE**
18                                    )
        Plaintiffs,                  )
19                                    )
   vs.                               )
20                                    )  **Date:   August 25, 2011**
   GLBT, Ltd., a British limited company,  )  **Time:   11:00 a.m.**
21 MASH and NEW, Ltd., a British limited   )  **Location: Ct Rm 4, 3rd Fl.**
   company, PORT 80, Ltd., a company of   )  **Judge:  Hon. Donna M. Ryu**
22 unknown origin or structure, STEVEN   )
   JOHN COMPTON, an individual living in  )  **Trial Date:  November 28, 2011**
23 the United Kingdom, and DAVID   )
   GRAHAM COMPTON, an individual   )
24 living in the United Kingdom.   )
                                    )
25                                    )
        Defendants.                 )
26 ─────────────────────────────────  )
                                    )
27                                    )

28

# NOTICE OF MOTION

PLEASE TAKE NOTICE that on August 25, 2011 at 11:00 a.m., in Courtroom 4 of the above-entitled Court, located at 1301 Clay Street, Oakland, California, Plaintiffs Io Group, Inc., Channel One Releasing, Inc., and Liberty Media Holdings, LLC., (collectively Plaintiffs) will, and hereby do move This Magistrate Court to issue a report and recommendations that the District Court enter terminating sanctions against Defendants for spoliation of evidence and other discovery violations pursuant to the Court's inherent powers and authority under Federal Rule of Civil Procedure 37.

This notice will be based on this Notice of Motion and Motion, the Points and Authorities herein, the declarations and exhibits to the Motion, pleadings and papers filed in this matter and on any other evidence as the parties may submit at the hearing on the Motion, if any.

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                          iii

TABLE OF AUTHORITIES                                                                       iv

**I.**   INTRODUCTION AND STATEMENT OF RELIEF SOUGHT                      1

**II.**  STATEMENT OF ISSUES TO BE DECIDED                                       2

**III.** RELEVANT FACTS AND BACKGROUND                                          2

    **A.**   Defendants' Responses to the Court's Questions re Spoliation      2

    **B.**   Defendants' Additional Discovery Responses                             7

        **i.**    Defendants failed to produce documents responsive to Request Number 7.    7

        **ii.**   Defendants failed to produce documents responsive to Request Number 9.    8

        **iii.**  For the first time, Defendants identified 1.8 million pages of responsive and relevant records, but refuses to deliver those documents based on Defendants' United Kingdom's Data Protection Act argument the Court previously rejected.    9

**IV.** LEGAL STANDARDS                                                                10

**V.**  ARGUMENT                                                                        12

    **A.**   The Court Should Preclude Defendants from offering additional information in opposing the pending Motions.    12

    **B.**   Defendants Willfully Destroyed Massive Amounts of Documents.    13

    **C.**   The Five Anheuser-Bush Factors Support an Order of Terminating Sanctions.    18

        **i.**    Expeditious Resolution of Litigation and Managing the Court's Docket and the Court's Need to Manage its Docket.    18

        **ii.**   The Risk of Prejudice to the Plaintiffs.    19

        **iii.**  Public Policy Pertaining to Disposition on the Merits    22

        **iv.**   The Availability of Less Drastic Sanctions    23

    **D.**   The Court Should Order Defendants' to Pay Monetary Sanctions Including Plaintiffs' Costs.    24

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337 (9th Cir. 1995)    *passim*

*Arista Records LLC v. Lime Group, LLC*, 715 F.Supp.2d 481 (S.D.N.Y. 2010), *opinion withdrawn and superseded*, (S.D.N.Y., May 2, 2011, 06 CV 5936 KMW) 2011 WL 1742029    20

*Cal. State Bd. of Equalization v. Renovizor's Inc*. (*In re Renovizor's, Inc.*), 282 F.3d 1233, (9th Cir. 2002)    8

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)    10

*Columbia Pictures v. Bunnell*, 2007 U.S. Dist. LEXIS 96360 (C.D. Cal. Dec. 13, 2007)    19-20, 24

*Columbia Pictures Indus., Inc. v. Fung*, CV 06-5578 SVW(JCX), 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009)    20

*Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2nd Cir. 2001)    12

*Gershwin Publishing Co v. Columbia Artists Management, Inc*, 443 F2d 1159, 1162 (2d Cir. 1971)    22

*Glover v. BIC Corp.*, 6 F.3d 1318 (9th Cir. 1993).    11

*In re Napster, Inc. Copyright Lit.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006)    15

*Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006).    *passim*

*Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, (D. Md. 2007)    8

*Malone v. U.S. Postal Service,* 833 F.2d 128 (9th Cir. 1987)    22

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.* (2005) 545 U.S. 913, 939,125 S.Ct. 2764, 2781, 162 L.Ed.2d 781    3, 20

*Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559 (N.D. Cal. 2008)    11

*Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3rd Cir. 1994)    11

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363 (9th Cir. 1992)    10,11

*United States v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir.2002)    13

*Vieste, LLC v. Hill Redwood Dev.*, 2011 U.S. Dist. LEXIS 59831, (N.D. Cal. June 6, 2011) — 12

*Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600 (9th Cir.1988) — 19

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) — 11


**<u>Statutes</u>**

17 U.S.C. §512 — 16, 20-21

Fed. R. Civ.Pro. 37(b)(2)(A) — 12

Fed. R. Evid. 1006 — 8

United Kingdome Data Protection Act — *passim*


**<u>Treatises</u>**

Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 901.02[1] (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 1997) — 8

Melville B. Nimmer and David Nimmer, 3 Nimmer on Copyright, Mathew Bender 2005 — 22-23

## I.  INTRODUCTION AND STATEMENT OF RELIEF SOUGHT

Plaintiffs served a set of thirty-six document production requests on January 14, 2011. [Declaration of D. Gill Sperlein in Support of Plaintiff's Motion for Spoliation Sanctions at ¶2]. In response, Defendants produced only a few documents.  [*Id*. at ¶3].  They produced no e-mails or other correspondence, no internal documents, and no audiovisual files.  [*Id*.].  Defendants claimed their lack of production was because they possessed no such documents, and that they routinely destroy such documents because of fears that they would be used against them in copyright infringement proceedings.  [Joint Letter re Discovery Disputes, Docket No. 55 at pg. 4]. At that time, Defendants commenced their unsupportable mantra that the United Kingdom's Data Protection Act prohibited them from producing the few relevant documents they had not destroyed.  The Parties met and conferred on the withheld and missing documents, and the Parties submitted a series of joint letter briefs to the Court.  [Docket Nos. 50, 52, 55].  Throughout the process, Defense Counsel thwarted Plaintiff's efforts to brief the issues adequately by refusing to identify the nature of the withheld or missing documents and by withholding Defendants' arguments until just before the letter briefs were due.  [Sperlein Declaration at ¶6].

Nonetheless, at a telephonic hearing on the discovery issues, the Court rejected Defendants' "extreme position" that the Court did not have the authority to order documents produced or to interpret the United Kingdom's Data Protection Act.  [Docket No. 57 at 2:24 – 3:10].   The Court ordered Defendants to produce all responsive documents, redacting *only* the names, street addresses and banking information of Defendants' customers.  [*Id*. at 4:1-7, *emphasis added*].

Moreover, the Court shared Plaintiffs' concern that Defendants had destroyed key evidence and thus ordered Defendants to respond to a series of questions designed to help the Court

determine whether Defendants had destroyed evidence.   [*Id*. at 4:8 – 5:3].  In spite of their evasive

responses to the Court's questions, Defendants did not attempt to hide the fact that they have

indeed destroyed key documents.  Subsequent deposition testimony confirms the level of

destruction, as well as Defendants' lack of remorse.  Defendants' actions severely prejudice

Plaintiffs, as the Defendants have completely admitted to destroying volumes of relevant and

responsive documents, which if produced would have resulted in a record that likely would have

ended this case (in the Plaintiffs' favor) at summary judgment.  Lesser sanctions would not be

adequate to punish the Defendants for the wrongful conduct, nor could lesser sanctions adequately

ameliorate the prejudice and harm to the Plaintiffs.  The Court previously referred all discovery

disputes to a Magistrate Judge.  [Docket No. 48].  Thus, Plaintiffs submit this motion for a report

and recommendation for terminating sanctions.

## II.  STATEMENT OF ISSUE TO BE DECIDED

Should the Magistrate issue a report and recommendations for the District Court to

exercise its power to issue terminating sanctions where Defendants have prejudiced Plaintiffs by

destroying vast amounts of key documents and lesser sanctions would not be adequate to punish

the Defendants for the wrongful conduct and ameliorate the prejudice and harm to the plaintiffs?

## III. RELEVANT FACTS AND BACKGROUND

### A.  Defendants' Responses to the Court's Questions re Spoliation

One of the key elements of a secondary infringement case is the extent of infringing

material on the Defendants' websites and the degree of knowledge held by the Defendants with

respect to infringing material on the site.  While this can sometimes be proven by circumstantial

evidence, internal communications or communications by third parties often make it possible to

-2-

prove the case by direct evidence.  *See*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*. (2005) 545 U.S. 913, 939,125 S.Ct. 2764, 2781, 162 L.Ed.2d 781.

Defendants have resisted all of Plaintiffs' attempts to gather information about the infringing websites Defendants own and operate.  In response to Plaintiffs' comprehensive document requests, Defendants provided stunningly few documents.  In response to one discovery request, the Defendants made the unsupportable assertion that the only documents in existence referring to the websites they operate were the publically accessible pages on the Internet, and that they possessed no other such documents because they were concerned that any record-keeping might create evidence that could be used against them or their users (who are equally guilty of copyright infringement) in copyright infringement cases.   [Docket No. 55 at pg. 4 ("As already stated, Defendants do not create many records, in large part due to constant threats made by lawyers in the United States.")].[1]  Further, Defendants took the outlandish position that a U.S. Court could not order them to produce documents, as long as they claim that they contain confidential information protected under the U.K. Data Protection Act.  The Parties previously argued their positions relevant to these discovery issues and the Court issued a Discovery order in which it directed Defendants to perform a number of actions.  Noting its concerns that Defendants may have destroyed evidence, the Court ordered Defendants to respond to seven questions.  [Docket No. 57].  On June 24, 2011, Defendants filed their responses.  [Docket No. 61].

The Court ordered each Defendant to "submit **a sworn, detailed declaration** providing the following information:

    1.      when the individual or entity became aware of Plaintiffs' lawsuit and how

---

[1] Although they claim their failure to retain documents was justified in part by the constant barrage of threats from U.S. lawyers, at deposition Defendants testified that the only threats of lawsuits they received came from Plaintiffs in this matter.  [Sperlein Declaration at ¶16(l)].

notification occurred;

   2.      what steps were taken by the individual or entity to preserve potentially relevant evidence and when the steps were taken;

   3.      identify each person whose files were searched for relevant evidence, and for each person, describe the types of relevant records in that person's possession (i.e. emails/electronically-stored information, hard copies of documents, etc.) and how the files are or were organized, stored, and maintained;

   4.      for each person whose files were searched for relevant evidence, describe the approximate number or size of relevant records;

   5.      what steps were taken by the individual or entity to gather documents responsive to discovery requests and when the steps were taken;

   6.      whether relevant information has been destroyed, and if so, describe the information as well as when and how it was destroyed and by whom; and

   7.      describe in detail the individual or entity's standard record retention/destruction policy (ies) and whether the policy(ies) was followed during the pendency of this litigation." *See* Docket No. 57.

   Individual Defendants David Graham Compton and Steven John Compton submitted sworn declarations on behalf of themselves and the Corporate Defendants.  [Docket No. 61].  In the declarations, Defendants admit they destroyed documents, although their disjointed, unclear, and evasive answers hide the true scope of the destruction of evidence.  For example, in response to Question 2, neither of the Comptons provided any information about steps they took to preserve potentially relevant evidence.  Similarly, neither Compton identified persons whose files were searched (Question 3), the number of size of the records (other than to state their database is

vast)(Question 4), what steps they took to gather responsive documents (Question 5), or what their

record retention policies are (Question 7).

With regard to Question 6, Defendant Steven Compton gave contradictory responses. First, he stated that Defendants have not destroyed any evidence relevant to the case. [Declaration of Steven Compton, Docket No. 61-1 at ¶6]. Then he made the bizarre claim that if they did destroy evidence, it hinders the defense not Plaintiffs' prosecution of the case. [*Id.*]. He continues by stating that if any evidence was deleted, it was done by his brother David. [*Id.*]. Finally, he states that if they destroyed evidence, they did it in order to comply with the U.K.'s Data Protection Act. [*Id.* at ¶7]. He does not explain the nature of the documents they destroyed, nor does he explain how he has such knowledge of how to interpret the U.K. Data Protection Act.

In addition to not being supported in law, Defendants' continued reliance on the Data Protection Act conflicts with their view of their customers' privacy as set forth in the Terms of Use regulating their websites, where they explicitly state, "**Gayforit also reserves the right to disclose personally identifiable information and/or non-personally-identifiable information that Gayforit believes, in good faith, is appropriate or necessary to enforce our Terms of Service, take precautions against liability, to investigate and defend itself against any third-party claims or allegations, to assist government enforcement agencies, to protect the security or integrity of the Gayforit Website, and to protect the rights, property, or personal safety of Gayforit, our users or others**." *See,* http://www.gayforit.com/privacy, last visited June 25, 2011. In other words, the Defendants have specifically carved out the right to use their users' personally identifying information when it serves their purposes. However, at every juncture in this litigation where disclosure of certain facts might hurt their defenses, the Defendants claimed that the U.K. Data Protection Act shields them from having to comply with discovery (without

actually providing any coherent arguments about how the Act is to be interpreted).  When their

spurious interpretation of the Act was uncovered, they took the position that this Court had simply

no authority to rule on any interpretation of the Act.

Defendant David Compton also provided inconsistent and unclear statements.

[Declaration of David Compton, Docket No. 61-2].  For example, while he stated that all relevant

information is contained in an extensive database, he provided no explanation as to what that

information includes.  [*Id*. at ¶4].  Moreover, he claims the database remains unaltered from when

Plaintiffs filed this lawsuit.  [*Id*.].  This statement simply defies credibility.  Defendants have

continued to operate their highly interactive websites throughout this litigation.  [Sperlein

Declaration at ¶8].  Certainly, the ongoing operation of the websites alters the information in their

database on a constant basis.

David Compton attempts to cloud the issues rather than clarify them by introducing the

idea that a layman's definition of "relevant" may be different from the legal definition of the term.

[*Id*. at ¶8].  However, he does not claim he based his document retention decisions on an incorrect

reliance on the layman definition.  He simply claims without explanation that he believes

"anything relevant in the true sense of the word has been kept".  [*Id*. at ¶4].  He does not explain

what the true sense of the word is, nor does he inform the Court upon what he bases his belief that

relevant documents have been preserved.  Like his brother, he states they did not destroy relevant

evidence but if they did it was in reliance on advice of Counsel and that any such destroyed

evidence would relate to their defense and not Plaintiffs' prosecution.  [*Id*. at ¶8].  He disputes

Steven Compton's Declaration by stating that deletions would have been done by him or his

brother.  [*Id*.].  Steven Compton, on the other hand, states that only David would have made

deletions.

-6-

The Declarations the Comptons filed with the Court fail to respond to the Court's questions, and in fact, these responses mock the Court's reasonable inquiry.  The declarations clearly establish the intentional destruction of key documents as discussed *infra*.  Moreover, Defendants' deposition testimony further establishes the full extent of the destruction and shows Defendants lack of remorse relating thereto.  For example, not only did the Defendants admit destroying documents as a matter of practice, Steven Compton admitted at his deposition that he destroyed his laptop, which contained discoverable evidence, because he was angry about the instant lawsuit.  [Sperlein Declaration at ¶16(m)].

## B.  Defendant's Additional Discovery Responses[2]

In addition to Ordering Defendants to respond to its questions relating to document preservation, the Court Ordered Defendants to provide copies of all responsive documents to Requests for Production Nos. 7, 9, 11, 27, 29, 30, 31 and 32.  [Docket No. 55, 3:19-4:7].  The Court ordered that Defendants could however "redact the names and street addresses of individual customers, as well as the individual customers' bank account and credit card account information."   [*Id*. at 4:3-5].  The Court specifically prohibited Defendants from redacting "user names, or the portion of an individuals' address that indicates city, county, and/or country."  [*Id*. at 4:5-7].  Defendants have defied the Court's order in a number of significant ways.

### i.  Defendants failed to produce documents responsive to Request No. 7.

Request No.7 demanded Defendants' billing files.  Rather than produce these files as the Court ordered, Defendants produced a spreadsheet that appears to be a summary or

compilation of the information found in the actual billing files.  This does not comply with the document request or the Court's order to respond to the document request.  Moreover, the summary fails to include information the Court prohibited Defendants from redacting, chiefly the user names of the Customers.  Given that fact discovery has closed, if the Court does not order terminating sanctions, it must extend discovery unilaterally in order for the Plaintiffs to fully examine the underlying data.  The Federal Rules of Evidence restrict the use of summary evidence and allows summary evidence only when "the originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place."  Fed. R. Evid. 1006.  "The originals or duplicates of voluminous writings, recordings, or photographs must be made available for examination or copying at a reasonable time or place in order for summary evidence to be admissible.  The right to examine the underlying records is absolute.  Thus, the records must be made available whether or not the opposing party makes a discovery request for inspection."  Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 901.02[1] (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 1997) at § 1006.06, citing *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 581 (D. Md. 2007).  See also, *Cal. State Bd. of Equalization v. Renovizor's Inc.* (*In re Renovizor's, Inc.*), 282 F.3d 1233, 1237 (9th Cir. 2002).

### ii.  Defendants failed to produce documents responsive to Request No. 9.

Through Document Request No. 9, Plaintiffs sought documents showing that Defendants terminated services for members who violated their repeat infringer policy.  Again, Defendants did not produce underlying records but only a "list of banned users" that appears to be summary

---

[2] The Court previously set forth an order that governs how the parties will proceed with discovery disputes.  Plaintiffs believe these procedures do not apply here because the Court has already directly ordered Defendants to produce the requested documents.  However, Plaintiffs include references to these discovery violations because Defendants' continued discovery abuse is evidence of their state of mind regarding the destruction of key evidence that is the focus of this

-8-

created on an Excel spreadsheet.  [Sperlein Declaration at ¶12, Exhibit B].  In the response to the Request for Production, Defendants did not provide any explanation of how they created the summary or from where they obtained the underlying data.  Presumably, the information came from the extensive database Defendants have now identified but refuse to produce.  David Compton gave a limited description of fields from the database in paragraph 5 of his Declaration.

The "add date" and "last login time" fields on the summary are in indecipherable formats. When Plaintiff's counsel inquired about this Defense Counsel simply stated, "That's just the way it is."  [Sperlein Declaration at ¶15].

Moreover, Defendants only provided information about users who had two or more notices of infringement and failed to include information regarding users who had received one notice of infringement.  Plaintiffs' discovery request clearly covered information concerning users who only received one notice of infringement.  Ordinarily, Defendants must provide the underlying records and for the reasons set forth *supra*.  However, here, Defendants have shown such a disregard for U.S. law that Plaintiffs fear they would alter any records or omit key records in such a manner that nothing they produce will be reliable or accurate.

        **iii.  For the first time, Defendants identified 1.8 million pages of responsive and relevant records, but refuses to deliver those documents based on Defendants' United Kingdom's Data Protection Act argument the Court previously rejected.**

It its earlier submissions to the Court, Defendants argued that the Court does not have the authority to order them to produce documents which they claim are protected under the United Kingdom's Data Protection Act.  The Court rejected this argument, but granted permission to Defendants to redact certain sensitive information, which the Court felt Plaintiffs had failed to adequately demonstrate as relevant to the proceedings.  [Docket No. 57 at 3:19-4:7].  In their

motion.

-9-

privilege log submitted with their latest responses, Defendants for the first time acknowledge that they have in their possession a vast number of responsive and relevant documents.  [Sperlein Declaration at ¶7].  They made this astounding addition without comment.  Defendants previously denied additional responsive records existed, and then argued that they were not responsive to even Plaintiff's broadest Discovery Requests.[3]  Although Defendants now apparently agree the records are relevant and responsive, they entered the entire class of records on their discovery log and refuse to produce them in direct violation of the Court's Discovery Order.  It seems they simply tried to slip this past Plaintiffs and the Court.

Under the Court's Discovery Order, Defendants must produce relevant documents and may only redact the actual names, addresses, and credit card numbers.  Should the Court decline to enter terminating sanctions against Defendants for their willful destruction of key documents, it must allow Plaintiffs additional time to examine and further explore any evidence that Defendants have not destroyed.

**IV. LEGAL STANDARDS**

"Courts are vested with inherent powers arising out of 'the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)).

---

[3]  For example, Plaintiffs requested all documents that reference Defendants' websites.  [Sperlein Declaration at ¶4].  Every page of Defendants' database is relevant and responsive to this request. Defendants did not object to the breadth of the request, but simply directed Plaintiffs to the urls for the websites.  [*Id.*]  Clearly, the documents in Defendants' database are responsive to this request, including those documents that are not available through the publically accessible url.

Thus, the Court has broad authority to impose sanctions for spoliation of evidence. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). The Ninth Circuit has clearly embraced and endorsed the courts' "inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).

Further, courts also have authority to sanction a party "who fails to obey an order to provide or permit discovery" pursuant to Federal Rule of Civil Procedure 37(b)(2)(A). *Leon,* 464 F.3d at 958. (internal quotation marks omitted).

To determine the type of sanctions to issue, courts generally consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 563 (N.D. Cal. 2008) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3rd Cir. 1994)). However, the final determination is "is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2nd Cir. 2001) (internal citations omitted).

Courts have developed three types of sanctions for destruction of evidence. First, "[t]he spoliation of evidence germane to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (internal quotation marks omitted). Second, a court can exclude witness testimony based on the spoliated evidence. *See,Unigard*, 982 F.2d at 368-369. Third, a court may dismiss the claim of the party responsible for the spoliation when the court determines that "a party has engaged deliberately in deceptive practices that

-11-

undermine the integrity of judicial proceedings." *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)). Here the Court will find that none of the lesser sanctions will provide a suitable remedy to correct the prejudice caused by Defendants' willful destruction of documents.

Although here the Defendants clearly destroyed documents in bad faith, the Court need not find bad faith by the offending party before issuing terminating sanctions for destruction of evidence; willfulness or fault may suffice. *Id.; Unigard*, 982 F.2d at 368 n.2." *See also, Vieste, LLC v. Hill Redwood Dev.*, 2011 U.S. Dist. LEXIS 59831, 11-14 (N.D. Cal. June 6, 2011).

Before imposing terminating sanctions the district court should consider the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch,* 69 F.3d at 348).

Application of these factors lead to but one conclusion; the Court must enter default against Defendants.

## V.  ARGUMENT

### A.  The Court Should Preclude Defendants from offering additional information in opposing the pending Motions.

The Court issued a discovery Order directing Defendants to provide detailed responses to seven questions.  [Docket 57 at 4:8-5:3].  The questions were specific and the Court emphasized the requirement that the responses must be detailed but entering the words "**a sworn, detailed declaration**" in bold.  [*Id.*]  Where Defendants ignored the Court's order and failed to provide detailed responses, Rule 37(b)(2)(A) allows for additional sanctions including prohibiting the

-12-

disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.  Fed. Rule Civ. Pro. 37(b)(2)(A)(ii).

Each time Plaintiffs successfully challenge one of Defendants' reasons for not complying with discovery rules, they come up with a new argument.  For example, when David Compton claimed he could not travel to the US because of kidney stones and Plaintiffs challenged that excuse, he supplemented his argument that he also has a general anxiety about traveling[4].  [Letter from David Compton's physician, Docket No. 54].  To Plaintiffs' argument that it is not feasible that they do not have additional responsive documents, Defendants now claim they have 1.8 million pages worth of documents but that those documents are protected from discovery under the United Kingdom's Data Protection Act.  [Sperlein Declaration at ¶7].  At some point, enough is enough and the Court must no longer allow Defendants to change their story or create new excuses.  With discovery now closed, that time has come.  With regard to Plaintiffs' claim of spoliation, the Court should order Defendants to stand on the dishonest declarations they mustered up in response to the Court's order.

**B.  Defendants Willfully Destroyed Massive Amounts of Documents.**

A party's destruction of evidence qualifies as willful spoliation if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir.2002).  Here Plaintiffs provided substantially more than "some notice".  Plaintiffs notified Defendants of their duty to preserve the very evidence they destroyed no fewer than three times.  [Sperlein Declaration at ¶13 and Exhibits C, D, and E].  The notices were specific, clear, and emphatic.

The first preservation notice read as follows:

"As litigation is very likely with regard to this matter, I once again remind you of your duty to preserve evidence.

**YOU ARE OBLIGATED TO PRESERVE ANY AND ALL EVIDENCE THAT MAY REASONABLY BE RELEVANT.  DO NOT DELETE OR ERASE ANY FILES FROM YOUR COMPUTER(S) OR REFORMAT/SCRUB YOUR HARD DRIVE(S).  IF YOU TAKE ANY ACTION THAT DESTROYS RELEVANT EVIDENCE, THE JUDGE MAY ALLOW AN INFERENCE THAT THE EVIDENCE WAS FAVORABLE TO THE OPPOSITION.  THE JUDGE ALSO COULD ORDER DEFAULT TO BE ENTERED IN FAVOR OF PLAINTIFFS OR IMPOSE OTHER SANCTIONS.   THIS DUTY TO PRESERVE EVIDENCE INCLUDES WITHOUT LIMITATION, ALL ELECTRONIC VIDEO FILES OR OTHER ELECTRONIC FILES AND/OR DATA RELATING TO COPYING OR TRANSMITTING VIDEO FILES, RELEVANT E-MAILS, DVDs, COPYING/RIPPING EQUIPMENT, OR PROGRAMS/APPLICATIONS USED TO COPY VIDEO FILES.  SUCH EVIDENCE ALSO INCLUDES COPIES OF ANY WORK REMOVED FROM YOUR SYSTEM AT THE DEMAND OF A COPYRIGHT HOLDER, INCLUDING BUT NOT LIMITED TO MY CLIENTS.  ALSO, PRESERVE ALL NOTICES OR REQUESTS TO REMOVE CONTENT AND ALL INFORMATION WITH REGARD TO ANY INDIVIDUAL WHO MAY HAVE PROVIDED CONTENT TO YOU OR YOUR AFFILIATED COMPANIES FOR REPRODUCTION AND DISTRIBUTION THROUGH THREE AFOREMENTIONED WEBSITES.   THIS LIST IS BY NO MEANS EXHAUSTIVE. SPECIFICALLY, PLEASE PRESERVE COPIES OF ANY VIDEO FILES THAT APPEAR OR HAVE APPEARED ON YOUR SITES, EVEN IF SUCH FILES ARE REMOVED FOR WHATEVER REASON."**  [Sperlein Declaration at ¶13 and Exhibit C]

Plaintiffs sent at least two other notices specifically informing Defendants of their duty to preserve evidence.  [*Id*., Exhibits D and E].  Defendants do not deny they received these notices or that they destroyed the very evidence the notices instructed them to retain.  [Sperlein Declaration at ¶16 (c)].

---

[4] Incidently, during deposition breaks, David Compton, his brother, and Mr. Capp shared stories about extensive world travel.  They spoke of Mallorca, Brazil, Gibraltar, Spain, and Ireland.  It is not clear which of these places David Compton had visited but it was clear he has enjoyed extensive travel.  [Sperlein Declaration at ¶17].

-14-

According to Defendants, they destroy every e-mail they receive or send and they continued to do so even after Plaintiffs' counsel specifically instructed them not to. [*Id*. at ¶16(d)]. Even if Defendants' policies included deleting emails, they were required to cease deleting emails once the duty to preserve attached. *In re Napster, Inc. Copyright Litigation* (N.D. Cal. 2006) 462 F.Supp.2d 1060, 1070. Moreover, Defendants appear to have no remorse, which some courts have considered in evaluating a party's culpability in connection with evidence destruction. *See*, *Leon* 464 F.3d at 956.

Defendants offer two excuses for ignoring their obligation to preserve evidence. First, they claim that they destroy all documents because of a fear that they documents may be used against them in a copyright infringement case. That fear is well founded. Second, they claim the laws of the United Kingdom, specifically the Data Protection Act, require them to destroy documents that contain personal data. This argument is insupportable. Two of the classes of destroyed evidence, audiovisual files and DMCA takedown notices, do not contain any personal data whatsoever. The third class of destroyed documents, e-mails, could potentially have private information but would have to be examined on a case-by-case basis to make that determination. However, even if some e-mails did contain personal information, no provision of the U.K. Data Protection Act requires destruction of such information, when litigation is pending in the United States. Furthermore, as the Plaintiffs have extensively discussed in a series of letter briefs, the Defendants' arguments pertaining to the Data Protection Act are ill placed, and their interpretation of the Act is unsupportable.

Here, as in earlier and ongoing discovery disputes, Defendants take the position that the U.K. Data Protection Act protects all of their documents from discovery without further analysis. Clearly, their reliance on the Data Protection Act is simply a desperate attempt to explain away

-15-

their destruction of vast amounts of key documents – documents which Plaintiffs instructed them

to preserve.  Moreover, litigants are not permitted to simply self-identify spurious privacy

concerns, and then ignore their obligations to preserve evidence because of these so-called

concerns.  *See, Leon*, 464 F.3d at 959.

In many cases, parties and courts must perform a thorough examination of various facts to

determine if evidence of spoliation exists.  Here no such exercise is necessary; Defendants have

openly admitted to spoliation of key, relevant, and necessary evidence.  "It is true we have deleted

the actual emails containing the DMCA notices."  [Declaration of Steven Compton, Docket No.

61-1 at ¶6 and Declaration of David Compton, Docket No. 61-2 at ¶8; Sperlein Declaration at

¶16(c), (e), and (f)].

The claim that Defendants destroyed DMCA take down notices in order to comply with

the United Kingdom's Data Protection Act is devoid of credibility.  Not only does the United

Kingdom's Data Protection Act not apply to these Defendants, but their Privacy Policy clearly

waives the Act when it suits the Defendants.  [Sperlein Declaration at ¶9, and Exhibit A]

Furthermore, DMCA take down notices are requests from copyright owners to remove infringing

content from a website. The required contents of such notices are set by statute and include: a

physical or electronic signature of a person authorized to act on behalf of the owner of an

exclusive right that is allegedly infringed; identification of the copyrighted work claimed to have

been infringed; identification of the material that is claimed to be infringing, information

reasonably sufficient to permit the service provider to contact the complaining party; a statement

that the complaining party has a good faith belief that use of the material in the manner

complained of is not authorized by the copyright owner; and a statement that the information in

the notification is accurate.  17 U.S.C. §512 (c)(3).  None of this information is of the private or

confidential type covered by the United Kingdom's Data Protection Act.  Takedown notices in fact would only contain information about the parties who sent these legal takedown notices to the Defendants.

Similarly, the actual audiovisual files of the works Plaintiff's and others demanded removed from the websites contained no personal data.  These files previously were broadcast across the Internet to anyone who bought a membership to the Defendants' websites.  It is remarkable that the Defendants claim that the infringing files, which they previously broadcast to any and all comers, now are protected by the U.K.'s Data Protection Act.  The convenient nature of this absurd argument should be clear – the Defendants' position is that any evidence that hurts their case is subject to a foreign law, and that this Court lacks the right to interpret that law.

Defendants did not destroy the notices or audiovisual files to protect the private information of their users; they destroyed them to protect themselves and they did so after Plaintiffs' counsel specifically instructed them not to.  Defendants reliance on the United Kingdom's Data Protection Act where it so clearly does not apply, calls into question Defendants' motivation in relying on the Act to oppose virtually every one of Plaintiffs' discovery requests. Should the Magistrate decline to issue a report recommending terminating sanctions, the Court should order Defendants to allow Plaintiffs full examination of their database and any files they did not destroy and should provide further opportunity to examine information found therein. However, with the most relevant documents destroyed such an examination would not begin to cure the prejudice Plaintiffs have suffered.

These facts clearly establish that Defendants have willfully "engaged in deceptive practices that undermine the integrity of judicial proceedings" and thus support an entry of default against Defendants.

**C.  The Five *Anheuser-Bush* Factors Support an Order of Terminating Sanctions.**

In *Anheuser-Bush*, the Ninth Circuit set forth five factors for determining when terminating sanctions are appropriate.  *Anheuser-Bush*, 69 F.3d at 348.  However, it is not necessary for the Court to explicitly consider each of these factors.  *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co*., 857 F.2d 600, 603(9th Cir.1988).  For terminating sanctions to be proper the Court must make only make a finding of "willfulness, fault or bad faith", and the Court must consider  the prejudice to the moving party and "less sever alternatives."  *Leon*, 464 F.3d at 958 (internal citations omitted).  Here, terminating sanctions are clearly required regardless of which analysis the Court applies.  Plaintiffs have established the willfulness of Defendants' actions in the discussion *supra*.   The following examination of the *Anheuser-Bush* factors establishes the extensive prejudice the Defendants' willful acts caused and the futility of imposing lesser sanctions.

**i.   Expeditious Resolution of Litigation and Managing the Court's Docket and the Court's Need to Manage its Docket.**

Other Courts have considered these two factors together.  *See*, *Columbia Pictures v. Bunnell*, 2007 U.S. Dist. LEXIS 96360 *19 (C.D. Cal. Dec. 13, 2007).  Defendants have changed their discovery responses a number of times, thereby providing Plaintiffs with somewhat of a moving target.  For example, in response to Plaintiffs' request for documents referring to the infringing websites, Defendants first responded, "All non privileged documents, see attached log, will be produced for inspection provided any production does not violate UK and European data protection legislation and/or the privacy rights of third parties."  When pressed for a more definitive answer, Defendants submitted a supplemental response that said simply, "[a]ll ages of the website located at www.gayforit.com."  [Sperlein Declaration at ¶4].

-18-

On the eve of the close of discovery, and only when ordered to respond by the Court, Defendants disclosed for the first time the existence of a database of 1.8 million pages worth of documents by adding a new entry on their Privilege Log.  They did not produce these documents; rather, they raised the now familiar claim that the U.K. Data Protection Act protects all of their documents from discovery.  [Id. at ¶¶4 and 7].  Where multiple discovery disputes have consumed a considerable amount of time these factors weigh strongly in favor of terminating the case in favor of Plaintiffs.  *Columbia Pictures v. Brunnell,* LEXIS 96360 *19.

**ii.    The Risk of Prejudice to the Plaintiffs.**

There is absolutely no way to determine the amount of prejudice Plaintiffs may have suffered as a result of this wanton disregard for the litigation process.  Without access to Defendants' e-mails relating to the operation of these websites, Plaintiffs have no way of exploring Defendants' motivation and cannot investigate patterns of behavior or Defendants' state of mind as might be reflected in e-mails.  In *Leon*, the Ninth Circuit upheld the district court's finding of sever prejudice where because of the party's actions there was "no way of knowing what might have been stored on the laptop and no reliable way of recreating what might have been there." *Leon*, 464 F.3d at 956.  Deletion of documents that are likely to be at the heart of the other party's case, threatens to distort the resolution of the case and thus clearly prejudices the party. *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir.1988)

Moreover, a single "smoking gun" document can often win a case of this nature.  In cases of secondary infringement based on inducement, internal documents are essential.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*. (2005) 545 U.S. 913, 939,125 S.Ct. 2764, 2781, 162 L.Ed.2d 781. (Defendant's internal documents provided proof of inducement rendering it ineligible for the safe harbors provided under 17 U.S.C. §512).  *See also*, *Arista Records LLC v.*

-19-

*Lime Group LLC* (S.D.N.Y. 2010) 715 F.Supp.2d 481, 510 *opinion withdrawn and superseded*, (S.D.N.Y., May 2, 2011, 06 CV 5936 KMW) 2011 WL 1742029; *Columbia Pictures Indus., Inc. v. Fung*, CV 06-5578 SVW(JCX), 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009).

Moreover, the extent of copyright infringement on Defendants' websites is one of three elements Courts consider when analyzing a claim of inducement to infringe. *Id.* The number of takedown notices a website receives alone does not determine the amount of actual infringement on the site since the actual amount of infringement is under reported. [Sperlein Declaration at ¶14] Nonetheless, the existence of a large number of takedown notices would indicate that a large portion of the material on the websites is infringing and that Defendants rely chiefly on infringement to earn their profits. Indeed, Defendants claim that take down notices are the *only* way to determine the extent of infringement on a website, while at the same time they admit that they destroyed every takedown notice they ever received. [Sperlein Declaration at ¶16(j)]. Similarly, if Defendants had preserved the actual audiovisual files they removed from their website subsequent to receiving claims of infringement, Plaintiffs could at least calculate the number of takedown requests Defendants received.

Plaintiffs could also examine the files and related metadata for any red flags indicating infringement was likely. Such red flags would make Defendants ineligible for DMCA safe harbor protections. 17 U.S.C. § 512 (c)(1)(A)("A service provider shall not be liable for monetary relief […] for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network […] if the service provider […] does not have actual knowledge that the material […] is infringing.")

Plaintiffs believe Defendants add and remove content to the websites independent of their users and regardless of whether they receive takedown notices. For example, if a user uploads a

video file that the Defendants believe detracts from the viewing experience, they may make the editorial decision to remove the video even though they did not receive a takedown notice.  Such editorial decisions would be evidence of a right and ability to control the content on the website and would render them ineligible for DMCA safe harbor protection.  17 USC §512(c)(1)(B) ("A service provider shall not be liable for monetary relief […] for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network […] if the service provider […] does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity").  Plaintiffs must prove similar facts to establish secondary infringement, in its case in chief.  Plaintiffs seek to hold the Defendants responsible for copyright infringement under the doctrines of contributory liability[5] and vicarious infringement.[6]  To prevail under these theories, the Plaintiff also must show there is an underlying claim of infringement against the direct infringers – in this case, the repeat infringers.  Moreover, by destroying the notices of infringement, Defendants likely destroyed any evidence that would allow Plaintiffs to prove that Defendants directly authorized certain individuals to upload infringing material.

Finally, in order to be eligible for DMCA safe harbor protection, Defendants must show they have in place a repeat infringer policy.  17 U.S.C. §512(i)(1)(A).  Defendants claim to have such a policy.  However, a repeat infringer policy would require Defendants to terminate users who previously submitted infringing material.  David Compton's deposition testimony clearly

---

[5] See, *Gershwin Publishing Co v. Columbia Artists Management, Inc*, 443 F2d 1159, 1162 (2d Cir. 1971) (a defendant is guilty of contributory liability if they, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another"); Melville B. Nimmer and David Nimmer, 3 Nimmer on Copyright § 12.04(A)(2) (Mathew Bender 2005).

-21-

establishes that Defendants did not have an effective repeat infringer policy[7]. However, without the ability to examine complaints of infringement, Plaintiffs have no way of further challenging the effective implementation of Defendants' claimed repeat infringer policy because they cannot examine whether Defendants actually terminated individuals who posted infringing material. Defendants methodically destroyed all of this evidence of take down notices and the targeted audiovisual files making it impossible for Plaintiffs to challenge Defendants' eligibility for safe harbor protection.

Defendants also claim that Plaintiffs themselves uploaded the infringing content in order to lure Defendants into infringing activity and then sue to the basis of that infringement.  Such a claim has no basis in fact.  [Sperlein Declaration at ¶16(k)].  However, Plaintiffs cannot prove who posted (or perhaps more importantly who did not post) the infringing content when Defendants have destroyed all related records.

The information contained in the destroyed audiovisual files and takedown notices touches virtually every element of Plaintiffs' copyright claims and every element of Defendants' defenses. Without those files, a fair trial on the merits is impossible.

  **iii. Public Policy Pertaining to Disposition on the Merits.**

"Although this factor weighs against dismissal, it is not sufficient to outweigh the other four factors, which in this case support dismissal."  *Malone v. U.S. Postal Service,* 833 F.2d 128, 133 n. 2 (9th Cir. 1987).

---

[6] *See,* 3 Nimmer on Copyright at § 12.04(A)(1) (describing the doctrine of vicarious liability as holding a defendant liable when they have "the right and ability to supervise infringing conduct" and receive an obvious and direct financial benefit from the actual infringement); *id* at § 12.04(A)(2) (vicarious infringement is rooted in the doctrine of respondeat superior).

[7] David Compton testified that when GLBT terminated a user from one of the three GLBT websites, they allowed the user to remain active on the other two websites.  Such a policy clearly is not an effective means of dealing with repeat infringers.  [Sperlein Declaration at¶16(n)].

Moreover, the public policy favoring disposition on the merits will not be served if the disposition of the matter is likely to be at odds with the underlying facts.  Furthermore, this Court would produce perverse public policy incentives if it rewarded the Defendants for their contumacious conduct.  When a defendant has made a true merit-based resolution impossible by ignoring discovery requests, overtly and unabashedly destroying evidence, and maintaining an unsupportable insistence that foreign law should excuse them from reasonable discovery requests (while simultaneously enjoying the privileges of making a profit from the American market), then this general policy consideration yields to the facts of this particular case.

### iv.    The Availability of Less Drastic Sanctions

In reviewing whether a district court properly considered lesser a reviewing court will examine: "(1) whether the district court explicitly discussed the feasibility of less drastic sanctions and explained why such alternate sanctions would be inappropriate; (2) whether the district court implemented alternative sanctions before ordering dismissal; and (3) whether the district court warned the party of the possibility of dismissal before ordering dismissal." *Leon*, 464 F.3d 960, *Citing*, *Anheuser-Busch*, 69 F.3d at 352.

However, the second and third criterion are inapplicable where the party destroys documents before the court has an opportunity to compel discovery, order lesser sanctions, or warn the party to preserve evidence.  *Id*.  Thus, the Court only needs to consider and discuss the availability of less drastic sanctions.

Because Defendants have destroyed key documents that can never be recovered, there are no lesser sanctions that could cure the prejudice caused by Defendants' actions. Where the issue is not the efforts by Defendants to introduce evidence that could be excluded, but rather Defendants' destruction or concealment of evidence, forcing Plaintiffs to go to trial with "incomplete and

-23-

spotty evidence" at trial, a rule excluding evidence would be futile.  *Columbia Pictures v.*

*Brunnell,* LEXIS 96360 at *15, *Citing*, *Anheuser–Busch*, 69 F.3d  at 348; *See also*, *Leon* 464 F.3d

960 ("A ruling excluding evidence would be futile, and fashioning a jury instruction that creates a

presumption in favor of [the non-destroying party] would leave [the Party] equally helpless to

rebut any material that [the destroying party] might use to overcome the presumption."  *Omitting*

*internal quotations*)

### D.  The Court Should Order Defendants' to Pay Monetary Sanctions Including Plaintiffs' Costs.

As noted, Defendants did not provide the information forming the basis of this motion for

sanctions until June 23, 2011, one week before the close of fact discovery.  Subsequently,

Plaintiffs' counsel prepared for and took the depositions of Defendants, responded to met with

Defendant to confer on other discovery disputes, briefed those issues to the Court and prepared

this Motion for Sanctions.  Plaintiffs' counsel has worked through evenings and the last two

weekends, including the Fourth of July holiday weekend.  Plaintiffs respectfully request an

opportunity to supplement this Motion with specific data on the time expended on these discovery

issues at a later time.

Respectfully submitted,

Dated: *July 6, 2011*

*/s/ D. Gill Sperlein*
D. GILL SPERLEIN
THE LAW OFFICE OF D. GILL SPERLEIN
Attorneys for Plaintiffs

Dated: *July 6, 2011*

*/s/ Marc Randazza*
Marc Randazza
General Counsel
Liberty Media Holdings, LLC
Attorneys for Plaintiffs