GILL SPERLEIN (172887)
THE LAW OFFICE OF GILL SPERLEIN
584 Castro Street, Suite 879
San Francisco, California  94114
Telephone: (415) 404-6615
Facsimile: (415) 404-6616
gill@sperleinlaw.com

MARC JOHN RANDAZA (269535)
RANDAZZA LEGAL GROUP
10620 Southern Highlands Parkway, 110-454
Las Vegas, NV 89141
Telephone: 888-667-1113
Facsimile: 305-437-7662 (fax)
MJR@randazza.com

Attorneys for Plaintiffs,

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IO GROUP, INC., a California corporation, CHANNEL ONE RELEASING, Inc., a California corporation and LIBERTY MEDIA HOLDINGS, LLC., a California corporation, <br><br> Plaintiffs, <br><br> vs. <br> GLBT, Ltd., a British limited company, MASH and NEW, Ltd., a British limited company, PORT 80, Ltd., a company of unknown origin or structure, STEVEN JOHN COMPTON, an individual living in the United Kingdom, and DAVID GRAHAM COMPTON, an individual living in the United Kingdom. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO.:  C-10-1282 (MMC)

**MOTION FOR TEMPORARY RESTRAINING ORDER, ORDER FOR SEIZURE AND APPOINTMENT OF RECEIVER, AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**Date:    August 12, 2011**
**Time:    9:00**
**CtRm:   7, 19th Fl**

**Request for Telephonic Appearance for Emergency TRO Hearing**

1

**TABLE OF CONTENTS**

I.  STATEMENT OF FACTS ........................................................................................... 1

II: PLAINTIFF SHOULD BE GRANTED AN  EX PARTE TEMPORARY RESTRAINING

ORDER ..................................................................................................................... 8

   A.      The Legal Standard for the Requested Relief Has Been Met ............................ 9

   B.      Plaintiff LMH Has A Substantial Likelihood of Prevailing on the Merits of Its Copyright

Claims .......................................................................................................... 9

   C.      The Defendants will not be able to establish a DMCA defense.......................... 12

   D.      Plaintiff is Equally Likely to Prevail on the Substantive Issues by Entry of Default. ......... 16

   E.      Plaintiff Suffers Irreparable Harm..................................................................... 16

   F.      The Balance of Equities Favors the Issuance of the Requested Injunctive Relief ............... 18

   G.      The Requested Relief is in the Public Interest ................................................... 19

   H.      Ex Parte Relief is Essential in this Action.......................................................... 19

III.  PLAINTIFFS WILL PROVIDE ADEQUATE SECURITY ................................................... 23

IV. DEFENDANT SHOULD BE ORDERED TO SHOW CAUSE REGARDING THE

ISSUANCE OF A PRELIMINARY INJUNCTION .................................................... 23

V.      THE COURT SHOULD APPOINT A RECEIVER  TO TAKE POSSESSION OF THE

DEFENDANTS' ASSETS ........................................................................................ 23

VI.  CONCLUSION ........................................................................................................ 24

i

**Cases**

*A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) ................................. 7

*Aimster Copyright Litig*., 334 F.3d 643, 650 (7th Cir. 2003) .................................... 17, 18

*Albert E. Price, Inc. v. Metzner, et al.*, 574 F. Supp. 281, 286 (E.D.Pa. 1983) ............................. 20

*Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ..................................... 10

*American Can Company v. Mansukhani*, 742 F.2d 314, 321 (7th Cir. 1984) ................................ 24

*Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521, 525 (9th Cir. 1984) ............. 19

*Apple Computer, Inc. v. Franklin Computer Corporation*, 714 F.2d 1240, 1254 (3d Cir. 1983).. 21, 22

*Arista Records LLC v. Lime Group LLC* (S.D.N.Y. 2010) 715 F.Supp.2d 481 ............................. 12

*Autoskill, Inc. v. National Educational Support Systems, Inc.*, 994 F.2d 1476, 1499 (10th Cir.)... 22

*Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) ......................... 19

*Century Home Entertainment, Inc. v. Laser Beat, Inc.*, 859 F.Supp. 636, 638 (E.D.N.Y. 1994)... 25

*Columbia Pictures Indus. v. Fung*, 96 U.S.P.Q.2D (BNA) 1620 n. 17 (C.D. Cal. 2009) ................. 5

*Columbia Pictures Indus., Inc. v. Fung*, CV 06-5578 SVW(JCX), 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) ...................................................................................... 12

*Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F. 3d. 878, 882 (9th Cir. 2003) ................................................................................................ 27

*Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288-89 (10th Cir. 1996) .................... 20

*Educational Testing Servs. V. Katzman*, 793 F.2d 533, 538 (3rd Cir. 1977) ............... 11, 12, 20, 21

*Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004) ........................................... 15

*Erickson v. Trinity Theatre, Inc*., 13 F.3d 1061, 1066 (7th Cir. 1994) ............................ 22

*F.W. Woolworth, Company v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed.2d 276 (1952)). ................................................................................... 9

*Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F.Supp. 248, 249 (S.D.Fla. 1982) ...................................................................................... 26

*First Technology Safety Systems, Inc. v. Depinet*, 11 F.3d 641, 651 (6th Cir. 1998) ................... 26

*Flavaworks v. Gunter*, 2011 U.S. Dist. LEXIS 50067 (N.D. Ill., July 27, 2011) ............... 16, 17, 18

*Fonovisa Inc. v. Cherry Auction, Inc*., 76 F.3d 259, 263-64 (9th Cir. 1996) ................................. 7

*Granny Goose Foods, Inc., et al. v. Brotherhood of Teamsters*, 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974) ................................................................................................ 23

*Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1141 (9th Cir. Cal. 2005) .................................. 10

<u>*In re Estate of Ferdinand Marcos, Human Rights Litigation*</u>, 25 F.3d 1467 (9th Cir. 1994) .... 7, 10, 14, 19

*In the Matter of Bernard L. Madoff Investment Securities, LLC*, (2009) EWHC 442 ...................... 3

*In The Matter Of: Vuitton Et Fils S.A.,* 606 F.2d 1 (2d Cir. 1991) .................................... 24, 25, 26

*Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003) ........................................................ 8

*Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) ................................................ 20

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 939 (U.S. 2005). ........................................ 13

*Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1376 (5th Cir. 1981) ................................ 9

*NBA Properties v. Various John Does*, 113 F.3d 1246 (10th Cir. 1997) .................................... 23

*Office Depot, Inc. v. Zuccarini*, 596 F.3d 696, 701-02 (9th Cir. 2010) .................................... 3, 8

*Palacio Del Mar Homeowners Assn., Inc. v. McMahon*, 174 Cal. App. 4 th 1386, 1391 (Cal. App. Div. 2009) ...................................................................................................... 8

*Pashaian vv. Eccelston Properties, Ltd.*, 88 F.3d 77, 86-87 (2d Cir. 1996) .................................... 9

*Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 832 (C.D. Cal. 2006) ...................................... 5

*Perfect 10, Inc. v. Amazon.com, Inc*, 2009 U.S. Dist. LEXIS 42341 at *20-21 (C.D. Cal. 2009) 14, 15

*Perfect 10, Inc. v. Cybernet Venutres, Inc.*, 213 F.Supp.2d 1146 (C.D.Cal. 2002) ...................... 22

*Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 561 (N.D. Tex. 1997), *affirmed without opinion*, 168 F.3d 486 (5th Cir. 1999) ...................................................... 9

*Reebok International, Inc. v. Marnatech Enterterprises, Inc.,* 970 F.2d 522 (9th Cir. 1992)......... 26

*Sid & Marty Kroft Television Prods. Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1162 (9th Cir 1977) ...................................................................................................... 11

*Signal Capital Corp. v. Frank*, 895 F. Supp. 62, 64 (S.D.N.Y. 1995) ........................................ 19

*Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006) ...................................................... 28

*The Walt Disney Company, v. Jim Garofalo*, 9:02-CV-5314 (E.D.N.Y. Nov. 12, 1992) .............. 27

*Universal City Studios, Inc. v. Ronnie Lorizzo*, 9:03-CV-5182(SJ) (E.D.N.Y. Nov. 17, 1993) ..... 27

*Vuitton v. White*, 945 F.2d 569 (3d Cir. 1991) .......................................................... 23, 26

*Wainwright Securities, Inc. v. Wall Street Transcript Corporation*, 558 F.2d 91, 94 (2d Cir. 1977)

.................................................................................................................................. 20

*Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.,* 797 F.2d 1222, 1231 (3d Cir. 1986),

*cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 984 (1987) .......................... 12

*Williams v. Scribd Inc.*, Case No. 09-cv-1836-LAB, 2010 U.S. Dist. LEXIS 90496 at *26-27 (S.D.

Cal. June 23, 2010)......................................................................................................... 7

**Statutes**

15 U.S.C. § 1116 ................................................................................................................. 1

17 U.S.C. § 502 ................................................................................................................... 1

17 U.S.C. § 503 ................................................................................................................... 1

17 U.S.C. § 512 ..................................................................................................... 15, 16, 18

Cal. Code Civ. Pro. §564.................................................................................................... 29

Pursuant to 17 U.S.C. §§502, 503, 15 U.S.C. §1116(d)(1)(A) and FED. R. CIV. PROC. Rule 65, Plaintiff moves this Court *ex parte* for a temporary restraining order to stop the Defendants' bad faith dissipation of assets by seizing domain name registrations, freezing Defendants' assets from dissipation, and returning matters to their state before the dissipation began. Because of the serious and immediate nature of Defendants' acts, Plaintiffs request and emergency hearing. Plaintiffs have notified Defense counsel telephone to inform him of this request.

## I.  STATEMENT OF FACTS

Defendants have engaged in wholesale copyright infringement of works produced by Plaintiffs by and through three websites Defendants operated at the domains itsallgay.com, gayforit.com, and jerkyourtube.com.  The assets Defendants hold in the United States are the domain name registrations for the three websites[1] and funds in an account with U.S.-based PayPal, Inc. (as well as funds processed through American Express, MasterCard, and Visa).

Facing entry of default based on their willful spoliation of evidence, Defendants are feverishly transferring the value of their assets out of the country. Without the intervention of this Court, Defendants will continue their ignoble and ongoing dissipation and transfer of assets from which Plaintiff's may collect on what has now become the inevitable judgment in Plaintiffs' favor.

Throughout this case, the Defendants have engaged in extreme bad-faith conduct.  They have destroyed key evidence.  They have lied under oath.  They have engaged in the most specious and unsupportable gamesmanship.[2]  They have promised the Plaintiffs that if Plaintiffs

---

[1] Domain name registrations for all .com domains are maintained within the State of California.  See *Office Depot, Inc. v. Zuccarini*, 596 F.3d 696, 701-02 (9th Cir. 2010) (finding that, as  VeriSign is located in the Northern District of California and subject to the court's jurisdiction, the court was entitled to exercise quasi in rem control over the domain names in satisfaction of a party judgment).

[2] For example, apparently in retaliation for Plaintiffs' Motion for Terminating Sanctions, Defendants filed an unwarranted motion for sanctions against Plaintiffs', falsely claiming Plaintiffs refused to pay Defendants' costs associated with attending depositions. In reality, Plaintiffs had offered numerous times to place funds in Defense Counsel's trust account. Opposition to Defendants' Motion for Sanctions, ECF 81, 4:24 to 5:2. In another example, Defense counsel refused to cooperate in joint briefing ordered by Magistrate Ryu and only submitted his portions of the letter briefs at the 11th hour. See, Joint Letter to Judge Ryu, ECF 55, p5, ¶1.

prevail, they will take efforts to frustrate collection efforts.  (June 21, 2011 e-mail from Jon Capp, Sperlein Declaration ¶2; Ex. A).  The Defendants' conduct reacting to the Motion for Terminating Sanctions  (ECF 63) shows that the Defendants intend to keep that promise, unless this Honorable Court intervenes, intervenes quickly, and intervenes with no equivocation.  Prior to evaluating this Motion, the Court should consider the Defendants' previous bad faith conduct.

Plaintiffs placed Defendants on notice to preserve evidence.  (See letters to Defendants, Sperlein Dec. in Support of Motion for Terminating Sanctions, ECF 64, ¶13, Exhibits C, D, and E). The Plaintiffs reported that any document destruction policies were suspended.  (ECF 11¶6).

Nevertheless, the Defendants then systematically destroyed key evidence.  For a full discussion, see Plaintiffs Motion for Terminating Sanctions.  (ECF 63).  See also, Opposition thereto admitting destruction of key evidence.  (ECF 69, 6:1-5); Declaration of David Compton, (ECF 61-2 at ¶8) (claiming that he did not destroy evidence, but if he did it was justified); Declaration of Stephen Compton, (ECF 71 at ¶ 6) (admitting destruction of a laptop containing key files, but claiming that doing so was excusable because it was done out of anger).

Throughout discovery, the Defendants refused to produce most documents. ECF 55 at pg. 8, ¶¶ 2-4.  Defendants claimed their lack of production was because they possessed no documents, and that they routinely destroy such documents because of fears that they would be used against them in infringement proceedings. See ECF 55 at pg. 4 ("As already stated, Defendants do not create many records, in large part due to constant threats made by lawyers in the United States.").[3]

The Plaintiffs have further refused to cooperate in discovery by presenting unsupported arguments that the "U.K. Data Protection Act" excuses their participation in discovery.  See Joint Letters re Discovery Disputes (ECF 50, 52, and 55); Order Re Joint Letter Re Discovery Dispute,

---

[3] Although they claim their failure to retain documents was justified in part by the constant barrage of threats from U.S. lawyers, at deposition Defendants testified that the only threats of lawsuits they received came from Plaintiffs in this matter.  [Steven Compton Depo. Tr. at 34:13-19.]

(ECF 57).  Defendants argued that it would be inappropriate for U.S. Court to enter an order construing the DPA and continued to advance this argument even after the Magistrate not only rejected it but referred to it as an "extreme position. "Order re Joint Letter re Discovery Disputes, ECF 57, 2:26 – 3:10.[4]

In addition to their contumacious behavior during discovery, the Defendants have repeatedly mocked this process by stating that if they do not prevail in this action, they will simply hide their assets offshore and thus frustrate the Plaintiffs' efforts to satisfy a judgment. Declaration of D. Gill Sperlein at ¶2; Exhibit A.  The Plaintiffs have informed the Defendants that the domain names used as instrumentalities of their illegal activity, being ".com" domain names, are governed by Verisign, Corp., a company domiciled in this country and thus their domain names would be subject to seizure.  *Office Depot, Inc. v. Zuccarini*, 596 F.3d at 701-02.

Having apparently taken this to heart, the Defendants have started the task of transferring their illegal operation to .eu domain names, and thus spiriting their assets offshore.  See Declaration of Matthew Leonard (hereinafter "Leonard Dec").  They do so because they believe that .eu domain names are outside the reach of this Honorable Court.[5]  See Declaration of Michael McQuaig (hereinafter, ""McQuaig Dec"), Attachments 1a, 1b, and 1c, which are a true and correct copies of the web pages at issue, gayforit.com, jerkyourtube.com, and itsallgay.com.

These three websites are now forwarded to gayforit.eu, jerkyourtube.eu, and itsallgay.eu. McQuaig Dec. at ¶¶ 1-2; Leonard Decl. at ¶11.  Furthermore, the websites now instruct viewers to "Change your bookmarks" to the .eu version. McQuaig Dec. Attachments 1a, 1b, and 1c.  The reason for this commercially-foolish change is clear -- the Defendants are fully aware that the bell

---

[4] This position is not only "extreme," but it lacks any foundation under the law of the United States or the United Kingdom. *See In the Matter of Bernard L. Madoff Investment Securities, LLC*, (2009) EWHC 442 (Ch), ¶¶9 and 10. (U.K. Court held that since the Data Protection Act allows for the transfer of personal data for the purposes of legal proceedings and since legal proceedings were likely in New York, the transfer was authorized).
[5] Plaintiffs believe that they are in error.  This court has jurisdiction over the Defendants and can issue orders pertaining to their property, within or without the United States.

3

is about to toll, and that this Court will likely award the Plaintiffs significant damages in this case. This an attempt to dissipate assets and to remove them from the reach of this court.  While this is not a typical asset dissipation, as in money being carried out of the country, it is operatively the same thing.  The currency for these websites is Internet traffic.  The traffic was currently flowing to the three .com domain names.  The Defendants' efforts are designed to move that traffic to .eu websites so that once the Defendants lose this case, and after the Plaintiffs seize the .com domain names, the Defendants will thumb their noses at the Plaintiffs and at this Honorable court – having removed everything they can from this Court's reach.  This court cannot stamp its imprimatur upon such actions by allowing them to take place unchecked.

The Damage that the Defendants are doing to the .com domain names is palpable and measurable.  Leonard Dec. at ¶ 19.  The domain names themselves have very little intrinsic value. Leonard Dec. at ¶¶ 4-8.  (Finding that the intrinsic value of each domain is less than $500).  The true value of these assets is derived from their traffic.  Leonard Dec. at ¶¶ 6 – 14.  This is measured using various tools including Alexa.com. Alexa, a service found at <alexa.com>, is a third party source of internet traffic information.  Courts have accepted the data presented by Alexa as reliable, accurate, and admissible data concerning the valuation and traffic statistics associated with a particular domain name. *Columbia Pictures Indus. v. Fung*, 96 U.S.P.Q.2D (BNA) 1620 n. 17 (C.D. Cal. 2009).  Courts previously have cited Alexa as a source of domain name traffic analysis and valuation.  See *Perfect 10 v. Google, Inc*., 416 F. Supp. 2d 828, 832 (C.D. Cal. 2006) (citing Alexa as a source for website traffic information about the <google.com> domain name).

4

Matthew Leonard is an experienced and expert domain valuation professional.  Leonard Dec. at ¶¶ 1-2. [6]  His methodology is discussed in his Declaration at ¶¶ 3-14.  According to the valueis.com website, and corroborated by Mr. Leonard's expert opinion, the three .com domain names at issue were worth a total of approximately $817,498 prior to the Defendants' actions leading to this Motion.  Leonard Dec. ¶¶ 12, 15, 19.  This amount would not approach the damages that are anticipated in this case, but it would provide some restitution for the Plaintiffs.

However, the Defendants' have now taken the .com websites at issue in this case, moved them to .eu websites, and merely use the .com domains as redirect domains.  McQuaig Dec. ¶ 2; Leonard Dec. ¶¶11 and 17.   This deliberate dissipative act is causing immediate, irreparable, and substantial harm to the value of these assets.  Leonard Dec. ¶ 19.

This is not mere coincidence.  The Plaintiffs filed a Motion for Terminating Sanctions (ECF 63) on July 6, 2011.  The re-direction of Gayforit.com, the most valuable of the three domains, took place on that day, or one of the days thereafter.  Leonard Dec. ¶¶ 15, 16, 19, Attch. 3, 4.  This domain was valued at $653,278 prior to a crash in traffic predicated by the Defendant's dissipative action.   Leonard Dec. ¶¶ 12(a), 14, Attch 2.   Since the Defendants began their dissipative action, traffic to the domain has dropped by 90%, thus reducing its value to $65,327 and dropping daily.  Leonard Dec. ¶ 20.  **In other words, as soon as the Defendants received the Plaintiffs' Motion for Terminating Sanctions, they immediately got to work dissipating one of the only assets that could be readily subject to an Order of this Court**.

Similarly, before the Defendants acts of asset dissipation, Itsallgay.com was worth approximately $111.446.  Leonard Dec. ¶¶ 12(b) 14, Attch 2.  Jerkyourtube.com was worth approximately $57,774.  Leonard Dec ¶ 12(c) 14, Attch 2.  The Defendants did not begin

---

[6] As Mr. Leonard's services were not known to be needed in this case, as the facts leading to this Motion were only discovered on August 8, 2011, he has not been previously disclosed as an Expert.  However, the Plaintiffs now disclose Mr. Leonard as an expert that they intend to rely upon in this case.

dissipating these two assets until a few days ago. Leonard Dec. ¶¶ 15, 16, 19, Attch. 3, 4.  In the past 7 days, these domains have lost 40% of their traffic.  Leonard Dec. ¶ 19.  Thus, they have lost approximately 40% of their value in that short time. Leonard Dec. ¶ 5-19.

There is no commercial reason for this change, except to spirit these valuable assets out of reach of this Court.  Leonard Dec. ¶¶ 55, 18.  See also Graeme B. Dinwoodie, *Trademark Laws and the (Non-National) Domain Name System*, 21 U. Pa. J. Int'l Econ. L 495 at n. 51 (.com domain names are the most valuable domain names). If this change is not reversed, then the assets will likely lose all of their value in a very short period of time.  Leonard Dec. ¶ 20.

If we review the Alexa statistics for gayforit.eu, itsallgay.eu, and jerkyourtube.eu, we see that these sites have had a drastic *increase* in traffic, and thus value, at precisely the same time as the U.S. – based .com domains are being choked to death.  Leonard Dec. at ¶ 16.  In other words, the record conclusively reflects that the three .com domains are suffering tremendous loss of value at exactly the same time the .eu domains are increasing in value, and this is all because the Defendants have directed the .com domain names to be mere forwards to the .eu  domain names, and have instructed their users to cease using the .com domain names.  The Defendants are dissipating their assets in the face of their impending loss of this case.  Leonard Dec. at ¶18.  This is certain given the timing following the filing of ECF 63.  Leonard Dec. at ¶ 15.

The destruction of these collectable assets is not merely theoretical.  Leonard Dec. at ¶ 19.  It is as if the Defendants were rapidly transferring currency from accounts in the United States to accounts offshore.  See *In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467 (9th Cir. 1994) (proper to issue an injunction to keep assets from being dissipated overseas, especially where defendant had engaged in a pattern of such activity).  Internet traffic is a tangible financial benefit.  A financial benefit exists where the availability of infringing material acts as a draw for customers. *Fonovisa Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996).

6

Where future revenue is dependent on one's user base, and expanding it, this traffic constitutes a financial benefit under copyright law. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001).  Where infringing content bases a subscriber of viewer base, it also boosts revenues on for-profit sites – however marginal that increase in revenue may be. *Williams v. Scribd Inc*., Case No. 09-cv-1836-LAB, 2010 U.S. Dist. LEXIS 90496 at *26-27 (S.D. Cal. June 23, 2010). Traffic is not merely a means to an end, but a commodity in its own right, the loss of which is deleterious to a site.  Leonard Dec. at ¶¶ 6, 8, 10, 19, 20.   Given that the domains will be subject to seizure in the event of an unpaid judgment, the Defendants' actions can not be allowed to stand without strong and immediate restraining action by this Court.

Domain names are property and are properly the object of a writ of execution. *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003); *Palacio Del Mar Homeowners Assn., Inc. v. McMahon*, 174 Cal. App. 4 th 1386, 1391 (Cal. App. Div. 2009); *Office Depot, Inc. v. Zuccarini*, 596 F.3d 696, 701-02 (9th Cir. 2010). Because VeriSign, the official registry for all ".com" and ".net" domain names, is based in California, this Court may exercise quasi *in rem* jurisdiction over the domain names to prevent their dissipation, disgorgement, or other changes thereto so that they may be preserved and executed upon in satisfaction of Liberty's eventual judgment against Defendants. *Zuccarini*, 596 F.3d at 702-03 (VeriSign is located in California and subject to the court's jurisdiction; court was entitled to exercise quasi *in rem* control over the domain names). The Court can preserve this valuable asset by putting it in the hands of a receiver during the pendency of this matter.

The Plaintiffs request an emergency temporary restraining order, ordering the domains gayforit.eu, itsallgay.eu, and jerkyoutube.eu and their analogous .com domain names placed under the control of the Court or a Court-appointed receiver.  This relief is not extreme, as the Defendants will still be able to profit from the .com domain names, they will continue to use them

as they have in the past (pending the outcome of trial), but they will be restrained from further destructive acts designed to frustrate judgment.  Furthermore, the Plaintiffs have discovered a PayPal account (PayPal is subject to this Court's jurisdiction) in which the Defendants have collected assets, and that the Defendants accept U.S. based credit cards.  Given their actions to date, it is clear that they will dissipate those assets as well, if they have not done so already.  Therefore, a TRO restraining the Defendants (or anyone acting in conjunction with them) from removing funds from that (or any other) account is an appropriate remedy.

## II: PLAINTIFF SHOULD BE GRANTED AN EX PARTE TEMPORARY RESTRAINING ORDER

The purpose of the penalty provisions of the Copyright Act is to "discourage wrongful infringement as well as to compensate the copyright owner." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1376 (5th Cir. 1981) (citing *F.W. Woolworth, Company v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed.2d 276 (1952)).  Both purposes will be frustrated if the Court fails to issue this order.  "Copyright infringement must not be allowed to serve as the cornerstone of a profitable business." *Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 561 (N.D. Tex. 1997), *affirmed without opinion*, 168 F.3d 486 (5th Cir. 1999).

Courts routinely issue preliminary injunctions freezing defendants' assets in circumstances like this one.  See, e.g., *Pashaian vv. Eccelston Properties, Ltd.*, 88 F.3d 77, 86-87 (2d Cir. 1996); *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1141 (9th Cir. Cal. 2005) ("district court did not abuse its discretion by concluding that the Hendricks would face a significant threat of irreparable injury if a preliminary injunction did not issue to prevent the Bank from honoring Mutual's draw").  "[A] district court has authority to issue a preliminary injunction where the plaintiffs can establish that money damages will be an inadequate remedy due to impending insolvency of the defendant." *In re Estate of Ferdinand Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994).

8

### A.      The Legal Standard for the Requested Relief Has Been Met

A court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest). *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

In light of the Defendants' bad faith conduct, this remedy is appropriate to ensure that the Defendants are not able to finish out their bad faith dissipation scheme.  The Defendants have engaged in extreme conduct, involving millions of dollars in damages.  If the Copyright Act is to mean anything, it should mean that such schemes do not provide a source of profit for cyber criminals who engage in them.   The Defendants see the writing on the wall:   Terminating sanctions are likely.  (ECF 63).  Even if the terminating sanctions are granted, the Defendants have virtually no chance of prevailing on the merits of this case.   The elements of copyright infringement have been fully established, and no affirmative defenses are likely to prevail.

### B.      Plaintiff LMH Has A Substantial Likelihood of Prevailing on the Merits of Its Copyright Claims

To show a substantial likelihood of prevailing on the merits of a copyright infringement claim, Plaintiff Liberty must show that: (1) it owns the copyright to which its infringement claims relate; and, (2) Defendants violated one of the Plaintiff's exclusive rights in the works. See *Sid & Marty Kroft Television Prods. Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1162 (9th Cir 1977); *Educational Testing Servs. V. Katzman*, 793 F.2d 533, 538 (3rd Cir. 1977). The issuance of a preliminary injunction rests in the sound discretion of the trial court.

The Certificates of Registration for the plaintiffs' works are of record in this case. 17 U.S.C. §410(c) specifies that the Certificate of Registration constitutes *prima facie* evidence of the validity and ownership of the copyrights.  Ownership is therefore established.

9

After establishing ownership, Plaintiffs must show unauthorized copying or distribution of its works.  17 U.S.C. § 106.  The evidence of unauthorized copying and distribution is clear and indisputable: The infringing works are exact digital copies of the Plaintiff's copyrighted materials.  See Sperlein Declaration at ¶3.  Plaintiffs did not authorize Defendants to make such copies or to distribute them.  *Id*. at ¶ 4.  Plaintiffs have therefore established a *prima facie* case of copyright infringement.  See *Sid & Marty Krofft,* 562 F.2d at 1162; *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.,* 797 F.2d 1222, 1231 (3d Cir. 1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 984 (1987); *Educational Testing, cited supra,* 793 F.2d at 538.   Because of the incontrovertible evidence of Plaintiffs' copyright ownership and Defendant GLBT's unauthorized copying, Plaintiffs have shown a clear likelihood that they will prevail in their claims.

The extent of copyright infringement by the defendants is one of three elements Courts consider when analyzing a claim of inducement to infringe. *Columbia Pictures Indus., Inc. v. Fung*, CV 06-5578 SVW(JCX), 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009).  *See also, Arista Records LLC v. Lime Group LLC* (S.D.N.Y. 2010) 715 F.Supp.2d 481, 510 opinion withdrawn and superseded, (S.D.N.Y., May 2, 2011, 06 CV 5936 KMW) 2011 WL 1742029.

In this case, the full extent of the infringement on the Defendants websites will never be able to be ascertained, due to the willful campaign of evidence destruction.  Opposition to Motion for Terminating Sanctions, ECF 69, 6:1-5 (admitting destruction of key evidence)  However, the extent of infringement that can be proven even on short notice is extensive.  See Declaration of Peter Phinney (hereinafter "Phinney Dec."); Declaration of Vaughn Greenwalt (hereinafter "Greenwalt Dec.).   The Phinney Declaration and the Greenwalt Declaration demonstrate that even now, in the throes of this contentious copyright infringement case, the Defendants continue to mount a campaign of infringement for profit.

10

To make matters worse, the Defendants have not only changed the location of their websites in order to dissipate assets, but they have established yet another new piracy business, which they use these three websites to promote. McQuaig Dec. at ¶¶ 17-18. This business is called "Its Hidden." McQuaig Dec. ¶ 3. It is the only advertisement on the Defendants' websites. McQuaig Dec. ¶ 4. This service is designed to assist intellectual property infringers in their illegal activities. McQuaig Dec. ¶ 6-16. This business is not a mere separate advertiser, but is owned by "Mash & New Limited," which is one of the defendants in this case. McQuaig Dec. ¶¶ 17, 18. At deposition David and Steven Compton testified, however, that this entity is no longer operational. David Compton Depo. Tr. (day One) at 9:15-23; Steven Compton Depo. Tr. At 10:13-11:8. Nonetheless, the Comptons continue to use the corporate name and id appears to be a mere their alter ego.

"Its Hidden" provides services that allow an Internet user to keep his or her IP address a secret. McQuaig Dec. ¶¶ 3, 15. These kinds of services are not automatically nefarious, as they can be useful for a number of purposes, for example, in countries where criticism of the government can lead to prosecution, hiding one's IP address might be a matter of life and death. McQuaig Dec. ¶ 16. However, learning the IP address of a "torrenter" is quite useful to frustrate intellectual property owners' efforts to bring infringers to justice. McQuaig Dec ¶ 7-14. Given the context of this advertisement, on a pirate video site, run by large-scale copyright scofflaws and not on a political dissident blog, it is clear what the intent is, it is clear who the target market is, and it is clear that the Defendants have but one purpose – to facilitate even more copyright infringement. McQuaig Dec. ¶ 16. This, itself, is further evidence of an intent to infringe. See *MGM Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 939 (U.S. 2005).

According to the Comptons, Mash and New is no longer a separate legal entity. To the extent they use the name it is simply a d/b/a or trade name. As the Comptons alter ego and part

and parcel of the illegal copyright infringement enterprise at the center of this case, should not be deemed to be a separate legal entity.  This business uses PayPal, a U.S. payment processor. McQuaig Dec. ¶ 18.  There are assets in the PayPal account that can be attached and held in receivership as well.  Furthermore, the Defendants accept credit cards on their piracy websites, and thus American Express, Mastercard, and Visa can be ordered to cease clearing their funds, and to hold them in escrow or deposit them with the Court or a Court-appointed receiver until the outcome of this case is determined.  Given the behavior of the Defendants thus far, it is eminently proper to issue injunctive relief, which would render these assets frozen in the United States until a judgment has been entered and satisfied.  *Marcos*, 25 F.3d at 1480 (9th Cir. 1994).

### C.      The Defendants will not be able to establish a DMCA defense.

The DMCA provides affirmative defenses to Internet service providers (ISPs) for copyright infringement, when formalities are met and the ISP's conduct is truly innocent. However, it is the Defendant's burden to prove their affirmative defenses, and this is a burden that, as a matter of law, Defendants will never be able to meet. Failures to strictly comply with the DMCA, even minor ones are sufficient to deprive an Internet service provider of the statute's safe harbor protections.  *See*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 2009 U.S. Dist. LEXIS 42341 at *20-21 (C.D. Cal. 2009) (failure to provide email address for a registered agent was insubstantial, but only where the agent's name, address, and telephone number were published on website).

The language of the DMCA is clear that its protections apply only to service providers[7] that have adopted, informed subscribers and "reasonably implemented" a repeat infringer policy. 17 U.S.C. § 512(i)(1)(A).  Even where a policy terminating repeat infringers exists and is communicated to subscribers and account-holders,[8] failure to reasonably implement it vitiates the

---

[7] Plaintiffs do not concede that Defendants are Internet Service providers as defined in the DMCA.
[8] There is no evidence in the record that a policy truly existed, nor that it was communicated to any account holders.

DMCA's safe harbor protections. *Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004) (finding that where DMCA take-down notifications fell into a "vacuum," it was sufficient for a reasonable trier of fact to conclude that the service provider had not reasonably implemented its policy against repeat infringers). Therefore, merely claiming to have a repeat infringer policy is not enough, and if any deficiencies exist, the DMCA's safe harbors are closed to the defendant. *See Ellison*, 357 F.3d at 1080; *Perfect 10*, 2009 U.S. Dist. LEXIS 42341 at *20-21.

Proving a negative is usually a fool's errand. However, while the Plaintiffs take the position that the Defendants lack DMCA protection for a multitude of reasons, the Plaintiffs can, with the evidence currently in the record, prove the lack of an effective repeat infringer policy, which alone defeats eligibility for DMCA safe harbor protections. Despite the destruction of key evidence by the Defendants, which would prove useful to cumulatively dispense with a DMCA defense on multiple grounds, the Defendants have admitted facts sufficient to take the DMCA safe harbor defense off the table. In order to be eligible for DMCA safe harbor protection, Defendants must show they have a repeat infringer policy. 17 U.S.C. §512(i)(1)(A). The lack of a valid repeat infringer policy dooms any DMCA defense. As the Northern District of Illinois recently held in a similar case, if there is no valid repeat infringer policy, then the other DMCA defenses need not be analyzed. *Flavaworks v. Gunter*, 2011 U.S. Dist. LEXIS 50067 (N.D. Ill., July 27, 2011).

Defendants claim to have a policy, but the policy is nothing more than unenforced words. A repeat infringer policy would require Defendants to terminate users who previously submitted infringing material. David Compton"s deposition testimony clearly establishes that Defendants had no such policy, but rather they simply moved infringers from one of their websites to another. David Compton testified that when GLBT terminated a user from one of the three GLBT websites, they allowed the user to remain active on the other two websites. David Compton Depo. Tr. (Day

One) at 196:14-23.   Such a policy clearly is not an effective means of dealing with repeat infringers.

Independently, there are other grounds under which the Plaintiffs can prove the negative: When the Plaintiffs have sent DMCA take-down notices to the Defendants, sometimes they take the content down, and other times they do not bother to do so.  Phinney Dec. ¶¶ 36-37.  When they do "terminate" a repeat infringer, they only remove the video that was the subject of the takedown notice and do not remove any of that infringer's other content in spite of the high likelihood that this content is also infringing.  Deposition of Christine Sampson, *en passim*.  They merely leave that content up, so that they can continue to sell subscriptions to their website – subscriptions to view the Plaintiffs' content without paying royalties to the Plaintiffs of any kind.  The Defendants claim that they take down content when asked to do so by the content owner.  That has been proven false.  Phinney Dec. at ¶¶ 36-37.  However, they also seem to believe that even if they did so, their responsibility would end there.  They are wrong.  "It is true that service providers are not required to police their sites for infringement, but they are required to investigate and respond to notices of infringement--with respect to content and repeat infringers." *Flavaworks v. Gunter*, 2011 U.S. Dist. LEXIS 50067 (N.D. Ill., July 27, 2011) (*citing In re Aimster Copyright Litig*., 334 F.3d 643, 650 (7th Cir. 2003) ("The [DMCA] does not abolish contributory infringement. The common element of its safe harbors is that the service provider must do what it can reasonably be asked to do to prevent the use of its service by 'repeat infringers.'")).  Much like the defendant in *Gunter*, and the defendant in *Aimster*, the Defendants in this case have engaged in what the Seventh Circuit called an "ostrich-like refusal to discover the extent to which its system was being used to infringe copyright," noting that it was "another piece of evidence" of contributory infringement. *Id*. It would be very easy for the Defendants to determine whether a particular user had posted multiple infringing copyrighted works.  However, the Defendants admittedly only

14

terminate an infringer from the one site where their infringing video was found.  David Compton Depo. Tr. (Day One) at 196:14-23.  The means of barring the infringer from signing back up is woefully soft – as they merely block by email address.  *Id*.  Repeat infringers are welcome to sign back up for a membership with an easily-generated Gmail or Yahoo email address. *Id*. at 62:23-64:7  However, most egregious is the admission that even though the Defendants manage a trio of piracy sites, if a user is banned from one for copyright infringement, he is not banned from the others, nor is he prohibited from signing up for a new membership on one of the others using the exact same user information.  *Id*. at 196:14-23.   Furthermore, even when the account holder is "banned," his content remains up, without inspection by the Defendants, as they willfully hide their heads in the sand in order to avoid knowledge of infringement.  This is not a repeat infringer policy.  This is a game of blindman's bluff mixed with three-card monty, and it does not excuse the Defendants' offenses.  "Willful blindness is knowledge, in copyright law (where indeed it may be enough that the defendant should have known of the *direct* infringement) . . . ."  *Aimster* at 650.

Moreover, safe harbor protection is not available to any ISP who receives a direct financial benefit from the infringing activity while declining to exercise its ability to control the infringing activity.   17 USC 512(c)(1)(A)(ii). ISPs who induce infringement are ineligible for DMCA safe harbor protections. Here, Defendants receive a direct financial benefit from the infringing activity by selling memberships to its websites for individuals to see the infringing works uploaded by its other members.   David Compton Depo. Tr. (Day One) at 12:4-20.  Moreover, they induce people to upload the content by providing free memberships to any user who uploads high-quality (i.e. professionally shot) content.  *Id*. at 18:20-33:5.  To compound factors, as explained above, when presented with evidence of infringement by specific users, the Defendants fail to take any action to prevent similar future infringement, and this is enough for liability. *Flavaworks* at 18.

15

Plaintiffs offer sufficient evidence in support of the instant *ex parte* application demonstrating a likelihood of success on its copyright claims.

**D.   Plaintiff is Equally Likely to Prevail on the Substantive Issues by Entry of Default**

As noted earlier Defendants have admitted to destroying all incoming and outgoing e-mails, all notices of claims of infringement and all audiovisual files copyright holders have requested removed from their websites.  As a result, Plaintiffs have filed a Motion for Entry of Terminating Sanctions (ECF 63).  In their Opposition Defendants utterly failed to offer any lesser sanction that would return the parties to equal footing.  Thus, the Court must grant Plaintiffs' Motion, thereby rendering Plaintiffs the prevailing party.

Even if the Court does not enter default, at a minimum the Court must not allow Defendants to invoke the safe harbor provisions of the DMCA since they destroyed evidence that would allow Plaintiffs to challenge their eligibility.  As set forth *supra*. without a DMCA defense there is no question that Plaintiffs own the copyrighted works and Defendants reproduced, publicly displayed and distributed the works by and through the websites they operate.

**E.   Plaintiff Suffers Irreparable Harm**

Irreparable harm exists where in the absence of equitable relief, there is a substantial chance that upon final resolution, the movant cannot be made whole.  See *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). "[A] district court has authority to issue a preliminary injunction where the plaintiffs can establish that money damages will be an inadequate remedy due to impending insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment." *Hilao v. Marcos* (In re Estate of Marcos), 25 F.3d 1467, 1480 (9th Cir. 1994).  If a party is likely to take actions that will frustrate a judgment, then the movant's irreparable harm is shown.  See *Signal Capital Corp. v. Frank*, 895 F. Supp. 62, 64 (S.D.N.Y. 1995).

Furthermore, the Plaintiffs have established that even in the face of this lawsuit, the Defendants are continuing to violate the Plaintiffs copyrights.  Phinney Dec. ¶¶ 5-37; Greenwalt Dec. ¶¶ 6-7.  It is well-settled that, on establishing a *prima facie* case of copyright infringement, irreparable injury **is presumed and preliminary injunctive relief is appropriate**.  See *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521, 525 (9th Cir. 1984); *see also Wainwright Securities, Inc. v. Wall Street Transcript Corporation*, 558 F.2d 91, 94 (2d Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed2d 759 (1978); *see generally* 3 M. Nimmer & D. Nimmer, Nimmer On Copyright, §14.06[A] (1998).

Courts presume irreparable injury because the "financial impact of copyright infringement is hard to measure and often involves intangible qualities such as customer goodwill."  *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288-89 (10th Cir. 1996).  When irreparable economic damages are difficult to calculate, a finding of irreparable harm is appropriate.  *See Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991).  The language of 17 U.S.C. §502 combined with the presumed irreparable harm in copyright cases permits the Court to focus solely on the plaintiff's likelihood of prevailing at trial when fashioning preliminary injunctive relief.  *See Albert E. Price, Inc. v. Metzner, et al.*, 574 F. Supp. 281, 286 (E.D.Pa. 1983); *see also Educational Testing*, *cited supra,* 793 F.2d at 544; *and see* 3 Nimmer On Copyright at §14.06[A].

The Plaintiffs have demonstrated a substantial likelihood of prevailing on the merits of their copyright and trademark claims and thus have established the element of irreparable harm.  *See Apple Computer, Inc. v. Franklin Computer Corporation*, 714 F.2d 1240, 1254 (3d Cir. 1983), *cert. dism.,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *see also Educational Testing*, *cited supra*, 793 F.2d at 543-544.  The Court should issue injunctive relief.

If the requested relief is not granted, Defendants will continue to quickly move their illegal business over to their .eu domain names, they will very likely transfer any funds in their PayPal

account to foreign bank accounts, and they will continue to move out of the United States funds being collected on their behalf by Mastercard, Visa, and American Express  thus allowing the impact of this litigation to be nil.

Furthermore, doing so immediately diminishes the value of the .com domain names. Leonard Dec. ¶¶ 19-20.  As the .com domain names are assets that the Plaintiffs will be able to seize (and likely will be required to), this amounts to willful destruction property within the United States that may be seized to satisfy a judgment.

**F.      The Balance of Equities Favors the Issuance of the Requested Injunctive Relief**

The requested temporary restraining order is limited in scope.  It does nothing more than prohibit Defendants from destroying their one state-side asset – their trio of domain names  and commands them to keep any assets flowing from the United States within the United States until this matter is resolved.

It is essential to freeze these domain names and any relevant U.S. funds for Plaintiffs to receive any possible relief.  Additionally, the preliminary injunction restrains Defendants from making further unauthorized copies of Plaintiffs' works and distributing pirated materials. Injunctive relief seeks nothing more than requiring Defendants comply with the Copyright, and preserving the *status quo* of Defendants' unlawful conduct and location of their ill-gotten gains. The imposition on Defendants' legitimate business activities (if any) is minimal and short-lived.

Plaintiffs continue to suffer irreparable harm.  The Defendants, even under the scrutiny of this litigation, continue to infringe upon the Plaintiffs' works.  Phinney Dec. ¶¶9-35; Greenwalt Dec. ¶¶ 6-7.The Plaintiffs' injury (continued infringement of Plaintiff's copyrights, and potential destruction of evidence) outweighs any possible damage caused to Defendants.

### G.     The Requested Relief is in the Public Interest

The public has a genuine interest in upholding copyright protections. *See Erickson v. Trinity Theatre, Inc*., 13 F.3d 1061, 1066 (7th Cir. 1994) (quoting *Apple Computer, Inc. v. Franklin Computer Corp*., 714 F.2d 1240, 1255 (3d Cir. 1983) ("It is virtually axiomatic that the public interest can only be served by upholding copyright protections . . . .")).. Defendants' illegal infringements flout the public policy underlying federal copyright law.  The copyright laws further the public's interest in protecting business investment, intellectual property, and enforcing federal law.  *See Autoskill, Inc. v. National Educational Support Systems, Inc.*, 994 F.2d 1476, 1499 (10th Cir.), *cert. denied,* 510 U.S. 916, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993), *see also* 3 NIMMER ON COPYRIGHT, *cited supra,* §14.06[A].   Congress enacted the Lanham Trademark Act to protect consumers against deceptive designations of the origin of goods.  *Perfect 10, Inc. v. Cybernet Venutres, Inc.*, 213 F.Supp.2d 1146 (C.D.Cal. 2002).  The public interest favors issuance of the requested relief.

Plaintiffs will succeed on their copyright and other claims.   Clear, immediate, and irreparable harm is present.  The balance of hardships weighs in favor of protecting the Plaintiffs' copyrights.   The TRO will further the public interest in enforcing federal law and protecting copyrights from piracy, and keeping scofflaws from evading responsibility for their actions.

### H.     Ex Parte Relief is Essential

FED. R. CIV. PROC. Rule 65 permits issuance of a temporary restraining order without prior notice to Defendants.  By its very terms, Rule 65 allows for the issuance of an *ex parte* order.

A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required.

An *ex parte* order preserves the *status quo* and prevents irreparable harm.  *See Granny Goose Foods, Inc., et al. v. Brotherhood of Teamsters*, 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).   Courts grant a temporary restraining order when: (1) immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party can be heard in opposition; and, (2) the applicant sufficiently demonstrates the reason notice should not be required.   Numerous courts recognized the need for *ex parte* temporary restraining orders in intellectual property cases.  See *Vuitton v. White*, 945 F.2d 569 (3d Cir. 1991); see also *NBA Properties v. Various John Does*, 113 F.3d 1246 (10th Cir. 1997), *dec'n without published opinion, reported in full at* 1997 U.S.App. LEXIS 11946 (10th Cir. 1997); and see *American Can Company v. Mansukhani*, 742 F.2d 314, 321 (7th Cir. 1984) (holding Rule 65 "expressly contemplates the issuance of *ex parte* temporary restraining orders").

Regarding the issuance of temporary restraining orders, the Second Circuit Court of Appeals issued a writ of mandamus ordering the district court grant *ex parte* relief:

> The ex parte temporary restraining order is indispensable to the commencement of an action when it is the sole method of preserving a state of affairs in which the court can provide effective final relief.  Immediate action is vital when imminent destruction of the disputed property, its removal beyond the confines of the state, or its sale to an innocent third party is threatened.   In these situations, giving the defendant notice of the application for an injunction could result in an inability to provide any relief at all.  *Id.* at 4, quoting *Developments In The Law – Injunctions*, 78 Harv. L. Rev. 994, 1060 (199965); see also *Fimab-Finanziaria MaglificioBiellese Fratelli Fila S.P.A. v. Kitchen*, 548 F. Supp. 2487, 249-250 (S.D. Fla. 1982) (recognizing the need for *ex parte* restraining orders in infringement cases and citing numerous unpublished orders granting such relief).
> *Vuitton Et Fils S.A.,* 606 F.2d 1 (2d Cir. 1991).

The Second Circuit held: "[t]he *ex parte* temporary restraining order is indispensable to the commencement of an action when it is the sole method of preserving a state of affairs in which the court can provide effective final relief.  Immediate action is vital when imminent destruction of the disputed property, its removal beyond the confines of the state, or its sale to an innocent third

party is threatened.  In these situations, giving the defendant notice of the application for an injunction could result in an inability to provide any relief at all." *Id.* at 2.  The Court further explained:

> [a]ssuming that all of the other requirements of Rule 65 are met, the rule by its very terms allows for the issuance of an *ex parte* temporary restraining order when (1) the failure to issue it would result in "immediate and irreparable injury, loss, or damage" and (2) the applicant sufficiently demonstrates the reason that notice "should not be required."  In a trademark infringement case such as this, a substantial likelihood of confusion constitutes, in and of itself, irreparable injury sufficient to satisfy the requirements of Rule 65(b)(1) . . .
> *Id.* at 3 (citations omitted.)

To obtain *ex parte* relief, a "Plaintiff need not show that a particular Defendant would not adhere to a temporary restraining order, but rather only that someone like the defendant would be likely to hide or destroy the evidence of his infringing activity."  *Century Home Entertainment, Inc. v. Laser Beat, Inc.*, 859 F.Supp. 636, 638 (E.D.N.Y. 1994) (citing *In The Matter Of: Vuitton, cited supra*).  In this case, U.S. based assets are being spirited offshore; Defendants are already destroying the value of their .com domain names.  Leonard Decl. *en passim.*.  The Defendants have behaved as dishonestly as possible by completely destroying mountains of evidence.  (ECF 63)  This despite their initial disclosures assuring the parties and the court that any document destruction was suspended.  (ECF 11, ¶6.).

Plaintiffs have substantial remedies awaiting them at the conclusion of this case. 17 U.S.C. §§502-505, 15 U.S.C. §§1116-18. However, remedial action is unavailable if Defendants destroy evidence of their illegal activities and remove funds beyond the reach of the Court.  Prior notice would "render fruitless further prosecution of the action." *Vuitton*, *cited supra*, 606 F.2d at 5.

Courts grant Rule 65(b) *ex parte* injunctive relief in two situations: (1) a showing that notice is impossible because plaintiff in unaware of the defendant's identity or location; or, (2) a showing that proceeding *ex parte* is the only method by which the court can fashion effective final

21

relief.  See *In The Matter Of: Vuitton***,** *cited supra*, 606 F.2d at 4.  To justify *ex parte* proceedings under situation (2) above, the movant must show: (1) the adverse party historically disposes of evidence or violates court orders; **_or,_** (2) that persons similar to the adverse party have such a history.  See *First Technology Safety Systems, Inc. v. Depinet*, 11 F.3d 641, 651 (6th Cir. 1998), *rehearing denied, en banc, Vector Research v. Howard & Howard Attorneys, P.C.,* 1996 U.S.App. LEXIS 7492 (6th Cir. 1996) (emphasis added, bold added).  In this case, this is not only a likelihood, but an established, and on-the-record certainty.  (Motion for Terminating Sanctions, ECF 63; Leonard Decl. *en passim*).

When giving notice to the defendants will result in the dumping of goods or other nefarious deeds, it is appropriate to issue ex parte orders without notice.  *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F.Supp. 248, 249 (S.D.Fla. 1982); *see also Vuitton, cited supra,* 606 F.2d at 2-3. *Ex parte* relief is sometimes the only effective tool for combating intellectual property theft when the defendants are overseas acting dishonestly.  See, e.g. *Reebok International, Inc. v. Marnatech Enterterprises, Inc.,* 970 F.2d 522 (9th Cir. 1992); *Vuitton v. White*, F.2d 569, 571-72 (3d Cir. 1991).  Plaintiffs are entitled to issuance of an *ex parte* temporary restraining order.  It is the only method of preserving the status quo because defendants have destroyed evidence and have taken affirmative steps to move assets beyond the court's reach.

A TRO is a appropriate.  Defendants' willful infringements, destruction of evidence, and dissipation of stateside assets make it critical that the Court order seizure before Defendants completely dissipate their funds and completely dismantle these assets.  Where danger of destruction or hiding evidence exists, the federal rules permit issuance of *ex parte* seizure and impoundment orders, and this is the kind of situation that the rule was intended to address.  *See Universal City Studios, Inc. v. Ronnie Lorizzo***,** 9:03-CV-5182(SJ) (E.D.N.Y. Nov. 17, 1993); *see also The Walt Disney Company, v. Jim Garofalo*, 9:02-CV-5314 (E.D.N.Y. Nov. 12, 1992).

22

### III.  PLAINTIFFS WILL PROVIDE ADEQUATE SECURITY

In the event that the Defendants **prove hardship**, they may propose a bond.  However, they bear the burden of showing  hardship.  See *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F. 3d. 878, 882 (9th Cir. 2003) (in an asset freeze injunction, "the bond amount may be zero if there is no evidence the party will suffer damages from the injunction").The likelihood of harm to the Defendants is nil. The only thing that a failure to grant the requested relief would do would be to allow the Defendants to continue their illegal enterprise and to continue to move to frustrate any judgment.  The entry of the requested injunctive relief would be no different than an injunction against a thief to stop fencing his stolen goods.  A bond is neither necessary, nor proper.

### IV. DEFENDANT SHOULD BE ORDERED TO SHOW CAUSE REGARDING THE ISSUANCE OF A PRELIMINARY INJUNCTION

The standard for issuance of preliminary injunction is equal to the standard for issuance of a temporary restraining order.  See *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006).  Plaintiffs have overcome the burden to meet these standards.  This Court should issue a show cause order requiring Defendants demonstrate any countervailing argument the Court should not issue a preliminary injunction continuing the relief granted in the temporary restraining order.

### V.   THE COURT SHOULD APPOINT A RECEIVER TO TAKE POSSESSION OF THE DEFENDANTS' ASSETS

The Court has jurisdiction to fashion an appropriate order to enable its own judgments to have meaning.  Federal rule of Civil Procedure 69(a) provides in pertinent part:

> In General. Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise.  The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable…"

23

Where Defendants attempt to secrete away assets in anticipation of a judgment, the Court may look to California law to protect Plaintiffs.  California law allows for the appointment of a receiver "where property in which plaintiff has a probable interest is in danger of being lost, removed or injured" (Cal. Civ. Pro. ¶564(b)(1)) and "in all other cases where necessary to preserve the property rights of any party."  Cal. Code Civ. Pro. §564(b)(9).

The only way to ensure that assets are available to Plaintiffs for recovery on their judgment is to appoint a receiver and order Defendants to turn over control of their .com and .eu websites to the receiver.  Their businesses can then function just as they do now, but they will not be able to resist collection on the value of their domains at the close of litigation.

## VI.  CONCLUSION

Defendants illegally distributed copies of the Plaintiffs copyrighted materials for profit. Defendants' conduct is patently indefensible.  It immediately and irreparably harms Plaintiffs. The Court should grant Plaintiffs' motions for a temporary restraining order, order for seizure, order for expedited discovery, and order to show cause.  The Court should grant these requests *ex parte* and without advance notice to Defendants to preserve the *status quo* and permit the Court to fashion effective relief at trial.

Respectfully Submitted,


Dated: *August 11, 2011*                                    s/ Marc Randazza
                                                                          Marc J. Randazza

                                                                          s/ D. Gill Sperlein
                                                                          D. Gill Sperlein

                                                                          Attorneys for Plaintiffs


24